# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 98-CA-00752-COA

**WILKINSON COUNTY BOARD OF SUPERVISORS**                    **APPELLANT**

**v.**

**QUALITY FARMS, INC.**                                               **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/15/1998 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EVERETT T. SANDERS |
| ATTORNEY FOR APPELLEE: | EDWARD P. LOBRANO, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | CIRCUIT COURT ORDERED THE BD. OF SUPERVISORS OF WILKINSON CO. TO PAY QUALITY FARMS FOR SERVICES IN THE REMOVAL OF SOLID WASTE. |
| DISPOSITION: | AFFIRMED - 07/20/1999 |
| MOTION FOR REHEARING FILED: | 8/10/99; denied 10/26/99 |
| CERTIORARI FILED: | ; granted 2/10/2000 |
| MANDATE ISSUED: | |

BEFORE KING, P.J., BRIDGES, AND LEE, JJ.

LEE, J., FOR THE COURT:

¶1. Quality Farms, Inc. was under a written contract with the Wilkinson County Board of Supervisors to provide garbage collection services for Wilkinson County. It appealed to the Wilkinson County Circuit Court the denial of a claim for additional services rendered to the county during the term of the contract. At the initial hearing the circuit court remanded the matter to the Board of Supervisors for additional consideration. The Board again denied the claim Quality Farms had submitted, and Quality Farms appealed the decision to the circuit court. At a final hearing the court found that the claim should be satisfied to the extent of $9,000. It is from that decision that the Board of Supervisors appeals. We affirm the findings of the Wilkinson County Circuit Court.

## STATEMENT OF FACTS

¶2. Quality Farms, Inc. and Wilkinson County Board of Supervisors entered into a contract under which Quality Farms agreed to collect and dispose of non-municipal residential solid waste in Wilkinson County for a twenty-four month period with the commencement date of the contract being December 7, 1992. This was a new service provided to the County. Quality Farms was to provide this service for each and every household within the service area at least once per week. Quality Farms was to submit its bill to the County for services rendered by the 24th of each month. The base rate of compensation under the contract for the first year of service was $16,500 per month for servicing up to 2,750 households and an additional $6 per household per month for servicing in excess of 2,750 households. The rate would be the same for the second year of the contract for service up to 3,000 households. The contract stated that the County would bear the responsibility of determining what constituted a "household" for collection and billing purposes. The contract also stated that the County was responsible for the collection of fees for services it provided. The County had established a billing office with an employee to send out statements and maintain records. It received the revenue from the billings directly without any involvement from Quality Farms. Quality Farms was to assist the billing clerk in identifying and determining the number of households it serviced.

¶3. Quality Farms submitted requests for payment during the contractual period indicating that it had serviced 2,750 households each month and requested compensation in the amount of $16,500 for each of the twenty four months. On December 30, 1994, Quality Farms submitted an additional invoice to the County for services rendered in excess of the base rate of the contract for both years of the contract. Quality Farms billed the County $18,000 for excess service for the first year of the contract, believing at the time that it had serviced an additional 250 households. For the second year it billed $9,000 for service to an excess of 125 households. The Board of Supervisors rejected this bill submitted by Quality Farms.

¶4. Quality Farms appealed the Board of Supervisors's decision to the Circuit Court of Wilkinson County. The court remanded the matter to the Board of Supervisors for reconsideration, stating that it "saw a lot of confusion about this contract" and that it could not determine from the record whether or not Quality Farms was entitled to additional payment. On remand, the Board was furnished with billing figures from its clerk, along with a revised statement from Quality Farms based on the billing figures. These figures showed the number of excess households serviced to be 170 per month for the two year period rather than 250 per month for the first year of service and 125 per month for the second year as first alleged. The Board reconsidered the matter and denied the claim based on the fact that it had compensated Quality Farms based on the invoices it had originally submitted and that it failed to file its claim for additional compensation in accordance with the terms of the contract. The Board did not dispute the number of households for which Quality Farms billed, but relied on its failure to state the correct number in its original invoices to the County.

¶5. Following the Board's second denial, a final hearing was held before the circuit court. The court entered an order denying Quality Farms' claim for additional compensation for the first year of the contract because of the untimeliness of the claim. However, it found that the invoice submitted as to the second year of the contract for $9,000 was timely, being submitted less than thirty days from the termination of the contract. It also found that the County was billing for approximately 170 more households than the base number during

the second year of the contract, that the contract was ambiguous as to the responsibility for determining the number of households served, and that Quality Farms was entitled to compensation for 170 households over the base number. Though the amount of compensation for service to 170 households in excess of the base number is $12,240, the circuit court limited the amount of compensation for these services to $9,000, the amount that Quality Farms requested in its invoice for the second year. It is from this decision that the Board of Supervisors appeals.

## STANDARD OF REVIEW

¶6. "It has long been recognized that the board of supervisors is a body which exercises judicial, legislative and executive powers." *Tally v. Board of Supervisors of Smith County*, 307 So. 2d 553, 556 (Miss. 1975). Accordingly, an appellate court's level of review of an action of a board of supervisors will differ depending upon the category of the power exercised in that action. It is clear that when a board of supervisors exercises a legislative power that is reviewed on appeal the court to which the appeal is taken shall only inquire into whether or not the action is reasonable and proper according to the facts disclosed, that is, whether the decision is supported by substantial evidence or is arbitrary or capricious, or beyond the power of the board to make, or whether it violates any constitutional right of the complaining party. *Ridgewood Land Company v. Simmons*, 243 Miss. 236, 247; 137 So. 2d 532, 536 (1962). *Miller v. Board of Supervisors of Forrest County*, 230 Miss. 849, 855; 94 So. 2d 604, 606 (1957). The level of review swings to the other end of the spectrum for matters such as tax appeals, which are tried by the circuit court "de novo," *Lenoir v. Madison County*, 641 So. 2d 1124, 1128 (Miss. 1994). For cases adjudicative in nature, as is the case *sub judice,* the level of review is proof by a preponderance of the evidence. *Barnes v. Board of Supervisors, De Soto County,* 553 So.2d 508, 510-11 (1989).

## DISCUSSION IN A CASE ARISING FROM A BOARD OF SUPERVISORS PROCEEDING, WHAT CONSTITUTES A RECORD SHOULD BE VIEWED MORE BROADLY THAN IN A PROCEEDING FROM A LOWER COURT.

¶7. This is a matter where judicial review lies only by appeal through the process where the party aggrieved by board action files a bill of exceptions in circuit court. Miss. Code Ann. § 11-51-75 (1972); *Moore v. Sanders*, 569 So. 2d 1148, 1149, (Miss. 1990); *Shannon Chair Company v. City of Houston*, 295 So. 2d 753, 754 (Miss. 1974). This process requires that the circuit court sit in an appellate capacity, *Thornton v. Wayne County Election Comm'n*, 272 So. 2d 298, 302 (Miss. 1973), which in turn finds that the board hold a hearing on the matter in issue, though not necessarily one according to the form of a trial in a court of law. *Cook,* 571 So. 2d at 934.

¶8. Given this backdrop, it is apparent that special concerns will arise regarding the evidence the court may consider. There is often no formal record of a board of supervisors proceeding other than the final order, as in the case *sub judice*. The bill of exceptions, therefore, serves as the record on appeal. As an appellate court, this is the only record before the circuit court. *Stewart v. City of Pascagoula*, 206 So. 2d 325, 328 (Miss. 1968). The scope of review is thus confined to the agreed upon bill of exceptions. As an appellate court, the circuit court cannot go outside the record as made in the bill of exceptions. *Id.* at 326.

¶9. The County contends that the excess number of households serviced beyond the contract minimum of 2,750 was not a part of the record. This argument is without merit since this information was clearly set out in the claim and in the bill of exceptions. "The circuit court reviews the record made before the board, of testimony made or *proffered,* to determine whether or not the acts and orders of the board are

reasonable."*Thornton v. Wayne County Election Comm'n*, 272 So. 2d 298, 301 (Miss. 1973) (emphasis added). The record shows that the circuit court looked at no facts, figures, or charts that had not been presented to the Board of Supervisors.

¶10. The Board of Supervisors contends that the circuit court made erroneous findings of fact. First, it asserts that the record does not support Quality Farms's claim that the county billed for 2,920 customers since this information is not found in the bill of exceptions or the amended bill of exceptions. Though the appellant is correct that this information is not stated in those bills, *Thornton* clearly allows the circuit court to review the record made before the Board of Supervisors. That record shows that Quality Farms stated at hearing on appeal to the Wilkinson County Board of Supervisors:

> Your Honor, basically what we would like to do is to furnish the Court what we did furnish the Board of Supervisors, which in visual graphic form shows the bill mailings that the county sent out during the life of their contract starting from a high of over 3,000 and . . . then on the third page shows the average of those billings at 2,920 per month was the average county billing that was sent out.

The record of the hearing on appeal shows that this information was presented to the circuit court just as it was to the Wilkinson County Board of Supervisors.

¶11. Also, the appellant implies that the court engaged in double talk by rejecting the contention that Quality Farms should be paid for an additional 170 households and simultaneously finding that it serviced 2,920 households (the base of 2,750 + 170 = 2,920). The circuit court, by concluding that Quality Farms serviced 2,920 households, did find that it serviced an excess of 170 households over the base number. However, it chose to limit Quality Farms's claim to service for 125 households or $9,000, the amount Quality Farms billed in its invoice, placing responsibility on Quality Farms to have timely billed the county for the proper number of households serviced. We find that the circuit court acted within its discretion to limit the amount of compensation to the amount billed in the invoice.

¶12. The appellant also contends that the court's finding of fact that Quality Farms submitted an additional invoice to the County for $27,000 for the additional households serviced for the two year period is not supported by the record. Again, the record shows that this information was presented to the Board. Appellant's narrow view of what constitutes a record leads it to this erroneous conclusion. *Thornton*, 272 So. 2d at 301.

¶13. The contention that the court erroneously found that the invoice submitted on December 30, 1994, as to the second year of the contract for $9,000 was timely superficially appears to have merit since the contract states that Quality Farms should submit its bill to the County for services by the 24th of each month indicating the number of locations served. Any argument by the County limiting payment to the minimum under the contract is vitiated by its silence as to the actual number of households being served and billed. It was in control of information pertinent to the contract and should have disclosed that information to Quality Farms at some point during its term. *Owen v. New York Life Insurance Company,* 126 Miss. 878, 89 So. 770, 773 (1921). We find that the circuit court acted within its discretion taking all the facts into account, in upholding the timeliness of the invoice submitted within thirty days from the termination of the contract.

¶14. We agree with the lower court that the contract is ambiguous as to which entity bears the responsibility for tallying the number of households served. On one hand the contract states that the County shall make

the determinations as to what constitutes a "household" for collection and billing purposes. On the other it states that the contractor, Quality Farms, shall endeavor to assist the County billing officer with billing changes and additions. The contract then states that Quality Farms shall submit its bill for services rendered by the 24th of each month, indicating the number of households serviced. It is very clear that the process of informing Quality Farms of the number of households it was servicing was not clearly defined. However, the nature of the service provided in the context of a rural setting indicates that a synergy was required between Quality Farms and Wilkinson County in order to determine the number of households that were being serviced. Quality Farms did not have the capacity to determine the number of households it serviced on its own simply by counting the number of stops it made since one stop was often designated to service several households. We therefore conclude that since the record shows that the billing office was in control of this information that it should have disclosed it. *Owen,* 89 So. at 773.

## CONCLUSION

¶15. We conclude that the judgment of the Circuit Court of Wilkinson County was proven by a preponderance of the evidence and is affirmed.

16.¶ **THE JUDGMENT OF THE WILKINSON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**BRIDGES, DIAZ, AND THOMAS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PAYNE, J. SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN C.J., AND KING. P.J. IRVING AND MOORE, JJ., NOT PARTICIPATING.**

KING, P.J., DISSENTING:

¶17. I respectfully dissent from the majority opinion herein.

¶18. The majority rejects the County's argument regarding the untimeliness of the invoice submitted by Quality Farms on December 30, 1994. The contract required Quality Farms to submit its bill by the 24th of each month. This bill was to include the specific " number of locations serviced". Pursuant to § 19-13-23 M.C.A., any amendment to Quality's bill was to be made prior to final approval or disapproval.

¶19. Quality filed its amended claim on December 30, 1994. At this time all of Quality's prior bills, with the possible exception of the December 1994 bill, had been either finally approved or rejected. Section 19-13-23 M.C.A., would therefore render these actions untimely and barred.

¶ 20. The majority would suggest that it was incumbent upon Wilkinson County to inform Quality Farms of the number of "households" from which Quality Farms collected solid waste and for which Quality Farms was to bill Wilkinson County. This in my opinion, requires a rather torturous reading of the contract. While the contract allows Wilkinson County to define what constitutes a "household," it does not require the County to conduct an actual count of the "households" from which Quality picked up solid waste. While it would have been considered good practice, it was not required.

¶21. The majority cites *Owens v. New York Life Insurance Company*, 89 So. 770 (Miss. 1921), to require Wilkinson County to inform Quality Farms of the number of "households" from which Quality Farms collected solid waste, and for which Quality Farms should bill Wilkinson County. This reliance in my

opinion is misplaced. *Owens* dealt specifically with dividend apportionment among policyholders, and its application towards their policy premiums. Since these dividends were arising from New York Life's annual surplus, such information was only available from New York Life, and Owens could not obtain the same from any source other than New York Life. In the present case there is no such information, which is within "the exclusive knowledge" of the County. *Owens*, 89 So. at 772.

¶22. Quality Farms had another source by which it could have determined the number of "households" from which it picked up solid waste. That source was to make an actual count of "households" as it picked up solid waste each month. Based upon that actual count, Quality Farms could then have submitted an accurate bill to Wilkinson County each month.

¶23. Wilkinson County and Quality Farms dealt with each other at arms length, as such Wilkinson County had no obligation to provide an actual count of "households" for Quality Farms.

¶24. For the foregoing reasons, I would reverse and render this case.

**PAYNE, J., JOINS THIS DISSENT.**

SOUTHWICK, P.J., DISSENTING

¶25. With deference to and respect for both the majority and the other dissenter, I write separately to explain my view that we should reinstate the order of the board of supervisors.

¶26. This review of a county board of supervisors resolution of a billing dispute raises several county government procedural questions:

1) the deadline by which Quality Farms had to submit a bill for additional payment under its contract; a necessary part of that determination is also to decide the relative obligations of the county and the private party in counting the number of households that were being served.

2) the proper method to litigate Quality Farm's dissatisfaction with the board's action;

3) the contents of the record of board action if an appeal to circuit court is taken; and

4) the standard of review of the county's adjudicatory action.

¶27. 1) *Timeliness.* The first question is the timeliness of the claim that was made. The county discusses a statute that requires that a "person having a just claim against any county shall first file the same on or before the last day of the month for which such claim may be payable"; the claim is then presented at the next board of supervisors meeting. Miss. Code Ann. § 19-13-23 (Rev. 1995). The county would have us hold that this means that any claim must be filed within the first month that it is owing, and any failure to file immediately and correctly bars seeking payment later.

¶28. Perhaps the statute should be interpreted in that fashion. On the other hand, the statute could be seen not as creating a deadline for a claim to be filed, but only as creating a time-line for processing a claim once it is filed. The applicable statute of limitations and the terms of the contract would then control on when the claim had to be filed. Under this statute, the claim is made in one month and is presented as part of the claims docket at the next month's board of supervisors meeting. The claim also can be amended at any time prior to final action by the supervisors. *Id.*

¶29. Regardless, I find that whether the claim was timely is irrelevant to whether the circuit court was correct in reversing the board of supervisors. I address the other issues.

¶30. 2) *Judicial procedure.* The board of supervisors denied any payment above the base amount of $16,500. Quality Farms decided to appeal from the denial of their claim. That was appropriate. Miss. Code Ann. § 11-51-75 (Rev. 1972). It also could have brought an independent action in circuit court. Miss. Code Ann. § 19-13-31 (1972). By bringing an appeal, it was limited to the record made in the board of supervisors. That record can only be presented to the circuit court and ultimately to the Court of Appeals or Supreme Court by bill of exceptions. Miss. Code Ann. § 11-51-75. I turn to whether there anything in the bill of exceptions that supports the surcharge for December 1994.

¶31. 3) *Contents of record.* The only documents made a part of the bill of exceptions are the contract of October 21, 1992, between Quality Farms and the county, the bill of December 30, 1994 in which the claim for $27,000 was made, and the board order denying the claim on April 21, 1995. The bill was not signed by the board president as required, and instead a response to the bill was prepared by the county. The response treated the bill as a complaint and admitted or denied the allegations.

¶32. This is incorrect procedure. The governmental body and the private party are to prepare an agreed bill, which in adversarial litigation can be a difficult requirement. The supreme court has created rules that assist even if they do not exactly simplify the chore. If an accurate bill of exceptions is presented, the president has the duty to sign it. *Polk v. City of Hattiesburg,* 109 Miss. 872, 874-75, 69 So. 675, 676 (1915), reaffirmed in *Koestler v. Dallas Tank Co.,* 234 Miss. 104, 109, 105 So. 2d 621, 623 (1958). Should the president refuse, a writ of mandamus may be issued by the circuit court if it finds that the bill is correct. If the board president in some fashion on the record admits the accuracy of the bill of exceptions, then no signature is necessary. *Id.*

¶33. Here, it appears the president believed that defects existed. It is not enough just to refuse to sign, but the president or his attorney must explain the specific perceived defect so that a correction can be sought. *Reed v. Adams*, 236 Miss. 333, 341, 111 So. 2d 222, 225 (1959). Thus no proper bill of exceptions was ever presented in this case.

¶34. Attached to the county's procedurally inappropriate response to the bill of exceptions were the invoices submitted each month by Quality Farms to the county, showing that only $16,500 was sought, and then a computer printout of disbursements by the county for solid waste charges. Presumably those were admitted before the board of supervisors and could have been made part of an agreed bill of exceptions.

¶35. The majority holds that in addition to the matters in the bill of exceptions, we should consider a statement by Quality Farms' attorney made at the circuit court hearing that he was presenting to the judge "in visual graphic form" some document that proved that the billings made by the county totaled about 3,000 households at one point and dropped to around 2,920 as an average. That apparently was a several page document but it is not in the record. According to the final circuit court order, the board received information on the county's billing and collection practices. I assume that the document is what the court was referencing.

¶36. First, I cannot accept that the number of households that the county decided to bill is relevant to the issue of the number of households actually served by the contractor. The county's responsibility to designate

households in order to bill residents certainly could impact Quality Farms' compensation since the contractor was paid based on the number of households. Yet the contract did not require Quality Farms to use the number derived by the county. The contractor was to submit monthly bills "indicating number of locations serviced," and thereby assert its claim to the base payment of $16,500 and to any additional amount for more households than were originally contemplated. Absent language in the contract that bound Quality Farms to the county's determination of the number of households, they were not bound. The monthly bill Quality Farms submitted would certify to a number of households. The county could accept the bill and pay it or could argue that the its own count of households was lower than that stated in the bill. Neither contracting party's count controlled the discretion of the other party. Should a dispute over the bill not be resolved, a judicial answer could be sought.

¶37. Therefore I find that Quality Farms had the obligation to make its own determination of the number of households. As Judge King points out, it may have had the best means to determine the number of locations from which trash was collected since it was performing the collection. Failure to assert the proper number cannot be excused by the county's failure to provide better information since that was not the county's responsibility under the contract. How exactly all this data worked together in determining Quality Farms' compensation was ambiguous under the contract and would have been a matter requiring resolution depending on the nature of the evidence presented.

¶38. Even if the number of households billed by the county was relevant, this evidence was not made a part of the only record that can be reviewed, namely, the bill of exceptions. Whatever weight it had is unavailable for our assessment.

¶39. Though I find the bill of exceptions process cumbersome and inefficient, it is the statutory requirement. We cannot uphold a circuit court reversal of the board based on evidence not in the record. I find that there is no evidence to support the surcharge sought for December 1994.

¶40. 4) *Review Standard.* A reviewing court's obligation on appeal regarding adjudicative decisions of a county board of supervisors is to determine whether the claimant proved by a preponderance of the evidence its entitlement to the claim. *See Barnes v. Board of Supervisors of DeSoto County*, 553 So. 2d 508, 510-11 (Miss. 1989)(special exception review). If the "Board's decision is founded upon substantial evidence," and is not arbitrary or capricious, it is binding on the court. *Id.* I find the denial of this claim to be in compliance with this standard.

¶41. I would reverse the circuit court and enter judgment for the board.

**McMILLIN, C.J. AND KING, P.J., JOIN THIS SEPARATE OPINION.**